# Exhibit 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF NEW JERSEY
 3
 4   DR. MILTON PRYSTOWSKY,    CIVIL ACTION NO.
     in his own right and      2:07-CV-00072-SDW-MCA
 5   as EXECUTOR OF THE
     ESTATE OF ROSE PRYSTOWSKY
 6              Plaintiffs,
 7      vs.
 8   TGC STORES, INC., ADT
     SECURITY SERVICES, INC.,
 9   INVACARE CORPORATION,
     GOLDEN BROTHERS, INC.,
10   d/b/a GOLDEN TECHNOLOGIES,
     PRIDE MOBILITY PRODUCTS
11   CORP., and JOHN DOES 4-10,
                Defendants.
12
13                  -  -  -
14        TUESDAY, JANUARY 31, 2012
15                  -  -  -
16           Oral deposition of ROBERT
     RADECKE, held in the offices of White and
17   Williams, 1800 One Liberty Place, 1650 Market
     Street, Philadelphia, Pennsylvania, commencing
18   at 10:24 a.m., on the above date, before
     Deborah L. Williams, a Professional Court
19   Reporter and a Notary Public.
20                  -  -  -
21
22
23
     VERITEXT NATIONAL COURT REPORTING COMPANY
24            MID-ATLANTIC DIVISION
        1801 Market Street - Suite 1800
25      Philadelphia, Pennsylvania 19103
```

1        ROBERT RADECKE
2    help.
3        MR. SIMMONS: He has his notes
4    here, too. This isn't a memory test.
5        THE WITNESS: The next time was
6    February 3rd, when I returned with
7    Caggiano to assist him in conducting his
8    engineering exam.
9  BY MR. SIMMONS:
10    Q. I'm going to ask you to take a
11  look at your invoice more closely.
12        Is there another entry between
13  January 8th and February 3rd?
14    A. Yeah, January 21st. I thought
15  that's what we were just talking about.
16        MS. CRINIGAN: When? He was
17    just going through the rolls of film for
18    January 8th. So he's asking what
19    happened after January 8th.
20        THE WITNESS: I apologize. I'm
21    getting tired. Okay.
22  BY MR. SIMMONS:
23    Q. What was the next thing you did
24  after the inspection on January 8th?
25    A. 21st, returned to the scene with

1              ROBERT RADECKE

2     Joe Caggiano, Deb Crinigan, David Wilson,

3     Nutley Fire, Vic Panico, Dave Kircher from the

4     Essex County Prosecutor's Arson Unit.

5          Q.     What was the purpose of that

6     unit?

7          A.     To familiarize everyone with

8     what we had.  Deborah came up to see the

9     scene.  Joe was there to -- for me to

10    familiarize him what with what we were dealing

11    with.  The other people were more of a

12    courtesy call.

13         Q.     Kircher and Wilson?

14         A.     Panico and Kircher were on their

15    way somewhere else and they knew we'd be

16    there, so they stopped by.  And Wilson was

17    with them.

18         Q.     Okay.  So they knew you were

19    coming to the fire scene?

20         A.     Yes.

21         Q.     How did they know?

22         A.     That's a good question.

23                I called Dave.

24         Q.     Do you know what date you called

25    Dave?

1           ROBERT RADECKE

2        A.    No, I've just got calls to Dave
3   here prior to the 21st.
4        Q.    How many calls did you have to
5   Dave?
6        A.    Three.
7        Q.    And how long did you spend on
8   those calls?
9        A.    First two, he wasn't there --
10  the first two calls, the notation, I didn't
11  get him.  The third call, I talked to him for
12  12 minutes.
13       Q.    Do you recall what you spoke
14  with Mr. Kircher about for that 12 minutes?
15       A.    No.
16       Q.    Is that during that call that
17  you told him you were coming to the scene on
18  the 21st?
19       A.    Yes.
20       Q.    And did he agree to meet you
21  there?
22       A.    No, there was no actual
23  agreement.  He said, you know, "If I get a
24  chance, I'll stop by."
25       Q.    Had they already completed their

Page 211

1               ROBERT RADECKE

2  investigation, "they" being the Essex County

3  Prosecutor's Office?

4        A.    I have no way of knowing that.

5        Q.    By the 21st, did Mr. Kircher

6  already form his belief that there were no

7  arson issues in this fire?

8        A.    The prosecutor's office doesn't

9  share that information.

10       Q.    Did you have an understanding

11 whether the Essex County Prosecutor's Office

12 had closed its file by January 21st, or was it

13 still an open file?

14       A.    I have no knowledge of that.

15       Q.    Was the January 21st meeting at

16 the Prystowsky home the first time you spoke

17 to Mr. Caggiano about this matter?

18       A.    I had called -- I don't know

19 whether he called me or I called him to say he

20 was coming to the scene.

21       Q.    Do you have a date of when that

22 call was?

23       A.    No.

24       Q.    Do you know how long you spent

25 with him on that call?

1           ROBERT RADECKE

2      A.    No.  Yeah, I've got -- excuse
3  me.  I apologize.  I've got three notations:
4  12 minutes, 12 minutes and 6 minutes.
5      Q.    So you spent about a half an
6  hour speaking to Mr. Caggiano before the 21st;
7  is that correct?
8      A.    No, the third one, we didn't get
9  him.  First two was 12 minutes each.  I don't
10 know how much time I spent talking to him.
11     Q.    Do you remember what you
12 discussed prior to the meeting on the 21st?
13     A.    No, other than he asked me what
14 do we got there, and I told him.
15     Q.    Did you tell him what you had
16 determined to be your area of origin?
17     A.    Yes.
18     Q.    Did you discuss what appliances
19 you'd located within the area of origin?
20     A.    No, because I couldn't identify
21 what was there, because there was a variety of
22 appliances, and hopefully you'll be able to
23 identify them.
24     Q.    Other than the general
25 discussion, here we are at the fire scene,

1                    ROBERT RADECKE
2    what did you do on January 21, 2004 at the
3    Prystowsky home?
4         A.    Well, we spoke with Joe to let
5    him know -- and he told me what we're going to
6    need, what we're going to have to do because
7    of the condition of the building with the
8    weather.  We discussed all of that.
9         Q.    Were the conditions at the
10   Prystowsky home with respect to ice worse when
11   you arrived on January 21st than they were
12   when you were there on January 8th?
13        A.    No, February 3rd was worse.
14        Q.    Okay.  What did Mr. Caggiano
15   tell you you were going to need with respect
16   to the condition of the home when you met
17   there on January 21st?
18        A.    He just asked me, "What are we
19   going to do with the scene?"  I said, "I'm
20   going to bring in heaters and we're going to
21   thaw it out as best we can."  That's basically
22   it.
23        Q.    So you formulated a plan on how
24   you were going to go through the debris?
25        A.    Correct.

1        ROBERT RADECKE

2     Q.    All right.  Was anything else
3  done at that meeting?
4     A.    Counsel, this was eight years
5  ago.  I just don't have -- until two weeks
6  ago, I haven't discussed this case.  I really
7  don't have any recollection of conversations.
8     Q.    I understand, but I have to ask
9  you the questions.  None of us were there, and
10 we're relying on your recollection and notes
11 to re-create what happened for us.  Okay?
12    A.    No problem.
13    Q.    And at the time you had been
14 retained to determine cause and origin,
15 correct?
16    A.    Yes.
17    Q.    And you knew that at some future
18 point in time, you were going to be asked
19 questions about what you were doing, what you
20 did, what you collected, things of that
21 nature, correct?
22    A.    Not always.
23    Q.    In this case did you understand
24 that this information may become relevant at
25 future times, this information being what you

1        ROBERT RADECKE
2   did and when on January 21st?
3        A.    In many cases it just gets
4   closed out, and that's the end of it.  No
5   report necessary.  There was no discussion of
6   this going anywhere or -- you know.
7        Q.    At January 21st, was there a
8   target appliance discussed among the group?
9        A.    No.
10       Q.    Were the appliances found within
11  your area of origin as you've defined it
12  discussed at that January 21st meeting?
13       A.    Discussed how?
14       Q.    In any respect.
15       A.    Other than it being there and
16  does anybody know what that is and things like
17  that.
18       Q.    Were debris piles moved?
19       A.    Not to my knowledge.
20       Q.    So this was a look-don't-touch
21  also?
22       A.    Don't touch for the Prystowskys
23  or anyone else that was in the building.  It
24  wasn't for myself and whoever was with me.
25       Q.    All right.  Do you recall doing

1            ROBERT RADECKE

2   any debris removal during that January 21st

3   inspection?

4         A.      Not that I know of.

5         Q.      Did you bring heaters to the 21

6   inspection?

7         A.      No -- I'm not sure.  I'll check

8   my jacket as far as the bills for heaters.

9               MS. CRINIGAN:  You also put a

10        bunch of stuff back in your --

11              MR. SIMMONS:  Yeah, but I kept

12        it out.  I didn't keep out the kerosene

13        fuel invoice, but I did keep out the

14        rentals.

15              THE WITNESS:  Oh, there's a time

16        stamp on it.  Yes, so there was one here

17        for -- two of the heaters I picked up

18        January 10th.  That can't be right.  And

19        the other one is February 3rd.

20              MS. CRINIGAN:  Did you put any

21        papers back in your file folder?  I saw

22        you put stuff in the side and zip it up.

23              MR. SIMMONS:  Yeah, but there's

24        no more rental -- you can look, but

25        there's no more rental certificates in

```
 1                    ROBERT RADECKE
 2      there.
 3              MS. CRINIGAN:  Just take the
 4      rest of your file out.
 5              THE WITNESS:  This is another
 6      rental agreement there.
 7              MS. CRINIGAN:  I just wanted to
 8      double check.
 9  BY MR. SIMMONS:
10      Q.      So to the best of your
11  recollection and from your file notes, there
12  were no heaters brought to the January 21st
13  inspection, correct?
14      A.      I'm not sure because that one
15  bill says the 10th.  It was after the 8th.
16  That's for the fuel, February 3rd.
17      Q.      Did anyone take any pictures at
18  the January 21st inspection?
19      A.      I don't think -- I didn't.
20      Q.      Why not?
21      A.      There was nothing to take
22  pictures of.
23      Q.      So to your knowledge, nothing
24  was moved within the area of origin as you
25  defined it, correct?
```

1                    ROBERT RADECKE

2        A.      Correct.
3        Q.      Did you take any notes of any
4    discussions that were had?
5        A.      No.
6        Q.      Did you tape record any
7    discussions that you had?
8        A.      No.
9        Q.      How long were you at the scene?
10       A.      Two hours.
11       Q.      And what did you do during that
12   two hours?
13       A.      Some of that was waiting for
14   everyone to assemble.
15               MR. SIMMONS:  Let me get marked
16       as the next exhibit number a page of
17       handwritten notes.  Our next exhibit
18       number is 247.
19                        - - -
20               (Whereupon, the document was
21       marked, for identification purposes,
22       Defendants' Exhibit Expert 247.)
23                        - - -
24   BY MR. SIMMONS:
25       Q.      Let me show you what we've

```
 1                   ROBERT RADECKE
 2    marked as 247.  This appears to be a breakdown
 3    by date of actual time on scene.
 4                   Is that accurate?
 5         A.        Okay.
 6         Q.        So does that help refresh your
 7    recollection about how long you were actually
 8    on the scene on January 21st?
 9         A.        Yes, same as on here, two hours.
10         Q.        Okay.  My question to you is:
11    What did you do during that two hours?  I
12    think you said part of it was you were waiting
13    outside for everybody to arrive.
14         A.        Yes.
15         Q.        What else?
16         A.        Took everyone in, showed them
17    what we had, discussed the scene.  That was
18    it.  I don't remember any other conversations.
19         Q.        Did you go down in the basement
20    and look at the breaker panel with that group?
21         A.        Yeah, Joe was there, went down
22    and showed him that.
23         Q.        Did anyone say, "There's a
24    series of breakers in this box indicating a
25    first floor breaker panel.  We should go look
```

Page 220

1               ROBERT RADECKE
2    for it"?
3        A.    No.
4        Q.    Do you recall anything else that
5    was done on January 21st?
6        A.    No.
7        Q.    What's the next activity you had
8    in this file?
9        A.    February 3rd, I returned with
10   Caggiano to remove the evidence.
11       Q.    Who went with you that day?
12       A.    Just Joe and I.
13       Q.    No helpers?
14       A.    No.
15       Q.    Did you need heaters?
16       A.    Yes.
17       Q.    Why?
18       A.    Because everything was frozen.
19       Q.    Had it rained inside the house
20   and then been frozen over?
21       A.    Part of it, yeah.
22       Q.    In the area that you defined as
23   the origin?
24       A.    It was frozen.  I don't know how
25   it got frozen.  I don't know if it was from