# Exhibit 1

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF NEW JERSEY
 3
 4   DR. MILTON PRYSTOWSKY,    CIVIL ACTION NO.
     in his own right and      2:07-CV-00072-SDW-MCA
 5   as EXECUTOR OF THE
     ESTATE OF ROSE PRYSTOWSKY
 6             Plaintiffs,
 7        vs.
 8   TGC STORES, INC., ADT
     SECURITY SERVICES, INC.,
 9   INVACARE CORPORATION,
     GOLDEN BROTHERS, INC.,
10   d/b/a GOLDEN TECHNOLOGIES,
     PRIDE MOBILITY PRODUCTS
11   CORP., and JOHN DOES 4-10,
               Defendants.
12
13                  -  -  -
14        TUESDAY, JANUARY 31, 2012
15                  -  -  -
16             Oral deposition of ROBERT
     RADECKE, held in the offices of White and
17   Williams, 1800 One Liberty Place, 1650 Market
     Street, Philadelphia, Pennsylvania, commencing
18   at 10:24 a.m., on the above date, before
     Deborah L. Williams, a Professional Court
19   Reporter and a Notary Public.
20                  -  -  -
21
22
23
     VERITEXT NATIONAL COURT REPORTING COMPANY
24           MID-ATLANTIC DIVISION
        1801 Market Street - Suite 1800
25       Philadelphia, Pennsylvania 19103
```

1          ROBERT RADECKE
2      help.
3          MR. SIMMONS:  He has his notes
4      here, too.  This isn't a memory test.
5          THE WITNESS:  The next time was
6      February 3rd, when I returned with
7      Caggiano to assist him in conducting his
8      engineering exam.
9  BY MR. SIMMONS:
10     Q.    I'm going to ask you to take a
11 look at your invoice more closely.
12          Is there another entry between
13 January 8th and February 3rd?
14     A.    Yeah, January 21st.  I thought
15 that's what we were just talking about.
16          MS. CRINIGAN:  When?  He was
17     just going through the rolls of film for
18     January 8th.  So he's asking what
19     happened after January 8th.
20          THE WITNESS:  I apologize.  I'm
21     getting tired.  Okay.
22 BY MR. SIMMONS:
23     Q.    What was the next thing you did
24 after the inspection on January 8th?
25     A.    21st, returned to the scene with

1                    ROBERT RADECKE

2    Joe Caggiano, Deb Crinigan, David Wilson,

3    Nutley Fire, Vic Panico, Dave Kircher from the

4    Essex County Prosecutor's Arson Unit.

5         Q.    What was the purpose of that

6    unit?

7         A.    To familiarize everyone with

8    what we had.  Deborah came up to see the

9    scene.  Joe was there to -- for me to

10   familiarize him what with what we were dealing

11   with.  The other people were more of a

12   courtesy call.

13        Q.    Kircher and Wilson?

14        A.    Panico and Kircher were on their

15   way somewhere else and they knew we'd be

16   there, so they stopped by.  And Wilson was

17   with them.

18        Q.    Okay.  So they knew you were

19   coming to the fire scene?

20        A.    Yes.

21        Q.    How did they know?

22        A.    That's a good question.

23              I called Dave.

24        Q.    Do you know what date you called

25   Dave?

1                    ROBERT RADECKE

2         A.    No, I've just got calls to Dave
3    here prior to the 21st.
4         Q.    How many calls did you have to
5    Dave?
6         A.    Three.
7         Q.    And how long did you spend on
8    those calls?
9         A.    First two, he wasn't there --
10   the first two calls, the notation, I didn't
11   get him. The third call, I talked to him for
12   12 minutes.
13        Q.    Do you recall what you spoke
14   with Mr. Kircher about for that 12 minutes?
15        A.    No.
16        Q.    Is that during that call that
17   you told him you were coming to the scene on
18   the 21st?
19        A.    Yes.
20        Q.    And did he agree to meet you
21   there?
22        A.    No, there was no actual
23   agreement. He said, you know, "If I get a
24   chance, I'll stop by."
25        Q.    Had they already completed their

1              ROBERT RADECKE

2   investigation, "they" being the Essex County

3   Prosecutor's Office?

4        A.    I have no way of knowing that.

5        Q.    By the 21st, did Mr. Kircher

6   already form his belief that there were no

7   arson issues in this fire?

8        A.    The prosecutor's office doesn't

9   share that information.

10       Q.    Did you have an understanding

11  whether the Essex County Prosecutor's Office

12  had closed its file by January 21st, or was it

13  still an open file?

14       A.    I have no knowledge of that.

15       Q.    Was the January 21st meeting at

16  the Prystowsky home the first time you spoke

17  to Mr. Caggiano about this matter?

18       A.    I had called -- I don't know

19  whether he called me or I called him to say he

20  was coming to the scene.

21       Q.    Do you have a date of when that

22  call was?

23       A.    No.

24       Q.    Do you know how long you spent

25  with him on that call?

1                    ROBERT RADECKE

2        A.    No.  Yeah, I've got -- excuse
3   me.  I apologize.  I've got three notations:
4   12 minutes, 12 minutes and 6 minutes.
5        Q.    So you spent about a half an
6   hour speaking to Mr. Caggiano before the 21st;
7   is that correct?
8        A.    No, the third one, we didn't get
9   him.  First two was 12 minutes each.  I don't
10  know how much time I spent talking to him.
11       Q.    Do you remember what you
12  discussed prior to the meeting on the 21st?
13       A.    No, other than he asked me what
14  do we got there, and I told him.
15       Q.    Did you tell him what you had
16  determined to be your area of origin?
17       A.    Yes.
18       Q.    Did you discuss what appliances
19  you'd located within the area of origin?
20       A.    No, because I couldn't identify
21  what was there, because there was a variety of
22  appliances, and hopefully you'll be able to
23  identify them.
24       Q.    Other than the general
25  discussion, here we are at the fire scene,

1                  ROBERT RADECKE
2     what did you do on January 21, 2004 at the
3     Prystowsky home?
4           A.    Well, we spoke with Joe to let
5     him know -- and he told me what we're going to
6     need, what we're going to have to do because
7     of the condition of the building with the
8     weather.  We discussed all of that.
9           Q.    Were the conditions at the
10    Prystowsky home with respect to ice worse when
11    you arrived on January 21st than they were
12    when you were there on January 8th?
13          A.    No, February 3rd was worse.
14          Q.    Okay.  What did Mr. Caggiano
15    tell you you were going to need with respect
16    to the condition of the home when you met
17    there on January 21st?
18          A.    He just asked me, "What are we
19    going to do with the scene?"  I said, "I'm
20    going to bring in heaters and we're going to
21    thaw it out as best we can."  That's basically
22    it.
23          Q.    So you formulated a plan on how
24    you were going to go through the debris?
25          A.    Correct.

1                    ROBERT RADECKE

2        Q.    All right.  Was anything else
3   done at that meeting?
4        A.    Counsel, this was eight years
5   ago.  I just don't have -- until two weeks
6   ago, I haven't discussed this case.  I really
7   don't have any recollection of conversations.
8        Q.    I understand, but I have to ask
9   you the questions.  None of us were there, and
10  we're relying on your recollection and notes
11  to re-create what happened for us.  Okay?
12       A.    No problem.
13       Q.    And at the time you had been
14  retained to determine cause and origin,
15  correct?
16       A.    Yes.
17       Q.    And you knew that at some future
18  point in time, you were going to be asked
19  questions about what you were doing, what you
20  did, what you collected, things of that
21  nature, correct?
22       A.    Not always.
23       Q.    In this case did you understand
24  that this information may become relevant at
25  future times, this information being what you

1            ROBERT RADECKE

2   did and when on January 21st?

3        A.    In many cases it just gets

4   closed out, and that's the end of it.  No

5   report necessary.  There was no discussion of

6   this going anywhere or -- you know.

7        Q.    At January 21st, was there a

8   target appliance discussed among the group?

9        A.    No.

10       Q.    Were the appliances found within

11  your area of origin as you've defined it

12  discussed at that January 21st meeting?

13       A.    Discussed how?

14       Q.    In any respect.

15       A.    Other than it being there and

16  does anybody know what that is and things like

17  that.

18       Q.    Were debris piles moved?

19       A.    Not to my knowledge.

20       Q.    So this was a look-don't-touch

21  also?

22       A.    Don't touch for the Prystowskys

23  or anyone else that was in the building.  It

24  wasn't for myself and whoever was with me.

25       Q.    All right.  Do you recall doing

1                    ROBERT RADECKE

2   any debris removal during that January 21st

3   inspection?

4        A.     Not that I know of.

5        Q.     Did you bring heaters to the 21

6   inspection?

7        A.     No -- I'm not sure.  I'll check

8   my jacket as far as the bills for heaters.

9              MS. CRINIGAN:  You also put a

10             bunch of stuff back in your --

11             MR. SIMMONS:  Yeah, but I kept

12             it out.  I didn't keep out the kerosene

13             fuel invoice, but I did keep out the

14             rentals.

15             THE WITNESS:  Oh, there's a time

16             stamp on it.  Yes, so there was one here

17             for -- two of the heaters I picked up

18             January 10th.  That can't be right.  And

19             the other one is February 3rd.

20             MS. CRINIGAN:  Did you put any

21             papers back in your file folder?  I saw

22             you put stuff in the side and zip it up.

23             MR. SIMMONS:  Yeah, but there's

24             no more rental -- you can look, but

25             there's no more rental certificates in

```
 1                  ROBERT RADECKE
 2      there.
 3              MS. CRINIGAN:  Just take the
 4      rest of your file out.
 5              THE WITNESS:  This is another
 6      rental agreement there.
 7              MS. CRINIGAN:  I just wanted to
 8      double check.
 9   BY MR. SIMMONS:
10      Q.      So to the best of your
11   recollection and from your file notes, there
12   were no heaters brought to the January 21st
13   inspection, correct?
14      A.      I'm not sure because that one
15   bill says the 10th.  It was after the 8th.
16   That's for the fuel, February 3rd.
17      Q.      Did anyone take any pictures at
18   the January 21st inspection?
19      A.      I don't think -- I didn't.
20      Q.      Why not?
21      A.      There was nothing to take
22   pictures of.
23      Q.      So to your knowledge, nothing
24   was moved within the area of origin as you
25   defined it, correct?
```

1           ROBERT RADECKE

2       A.   Correct.

3       Q.   Did you take any notes of any

4    discussions that were had?

5       A.   No.

6       Q.   Did you tape record any

7    discussions that you had?

8       A.   No.

9       Q.   How long were you at the scene?

10      A.   Two hours.

11      Q.   And what did you do during that

12   two hours?

13      A.   Some of that was waiting for

14   everyone to assemble.

15           MR. SIMMONS:  Let me get marked

16       as the next exhibit number a page of

17       handwritten notes.  Our next exhibit

18       number is 247.

19                 - - -

20           (Whereupon, the document was

21       marked, for identification purposes,

22       Defendants' Exhibit Expert 247.)

23                 - - -

24   BY MR. SIMMONS:

25      Q.   Let me show you what we've

1                    ROBERT RADECKE

2    marked as 247.  This appears to be a breakdown

3    by date of actual time on scene.

4                Is that accurate?

5        A.     Okay.

6        Q.     So does that help refresh your

7    recollection about how long you were actually

8    on the scene on January 21st?

9        A.     Yes, same as on here, two hours.

10       Q.     Okay.  My question to you is:

11   What did you do during that two hours?  I

12   think you said part of it was you were waiting

13   outside for everybody to arrive.

14       A.     Yes.

15       Q.     What else?

16       A.     Took everyone in, showed them

17   what we had, discussed the scene.  That was

18   it.  I don't remember any other conversations.

19       Q.     Did you go down in the basement

20   and look at the breaker panel with that group?

21       A.     Yeah, Joe was there, went down

22   and showed him that.

23       Q.     Did anyone say, "There's a

24   series of breakers in this box indicating a

25   first floor breaker panel.  We should go look

```
 1                  ROBERT RADECKE
 2    for it"?
 3         A.    No.
 4         Q.    Do you recall anything else that
 5    was done on January 21st?
 6         A.    No.
 7         Q.    What's the next activity you had
 8    in this file?
 9         A.    February 3rd, I returned with
10    Caggiano to remove the evidence.
11         Q.    Who went with you that day?
12         A.    Just Joe and I.
13         Q.    No helpers?
14         A.    No.
15         Q.    Did you need heaters?
16         A.    Yes.
17         Q.    Why?
18         A.    Because everything was frozen.
19         Q.    Had it rained inside the house
20    and then been frozen over?
21         A.    Part of it, yeah.
22         Q.    In the area that you defined as
23    the origin?
24         A.    It was frozen.  I don't know how
25    it got frozen.  I don't know if it was from
```